**Report Regarding: Ju Yang vs. American Family Insurance**

---

Prepared by:

Dr. Ian Baird
Associate Professor
Department of Geography
University of Wisconsin-Madison
935 O'Sheridan St.
Madison, Wisconsin,
USA 53715
ibaird@wisc.edu
1-608-285-5504

---

April 24, 2019

# TABLE OF CONTENTS

1.0 Introduction                                        3

2.0 Summary of Findings                                 3

3.0 Qualifications                                      4

4.0 Background                                          4

5.0 Sources of Information                              5

6.0 My Assessment                                       6

7.0 My Opinion                                          9

8.0 Statement of Compliance                             10

9.0 Statement of Truth                                  11

10.0    References                                      12

**1.0. Introduction**

1.1. This report is being prepared on the request of Mr. Daniel Jardine, a lawyer representing Ju Yang. He specifically requested that I prepare this expert report in a letter dated April 23, 2019. Ms. Jardine is acting on behalf of Ms. Ju Yang with regard to a case regarding her being firing in November 2010 by American Family Group (American Family). This report relates to the reason for firing Ms. Yang.

1.2. Specifically, Mr. Jardine made the following request, which is the basis for this report:

"If you could please prepare a brief letter or report to me, it would be greatly appreciated. Your report should contain the following:

1. A statement of the opinions you will express and the basis and reasons for them;

2. The facts or data considered by you in forming those opinions;

3. Any exhibits you would like to use to summarize or support your opinions (this would include not only Mr. Katzenstein's e-mail, but any other documents [articles, studies, etc.] that you would like to use to support your testimony);

4. Your qualifications, including a list of all publications authored in the previous 10 years (if your *curriculum vitae* suffices, you may merely so state);

5. A list of all other cases in which, during the previous 4 years, you have testified as an expert at trial or by deposition; and

6. A statement of the compensation to be paid for the study and testimony."

**2.0. Summary of Findings**

In Summary, there is no reason to believe that Hmong or Asian American men who have recently divorced their wives, or are facing marital difficulties, are more likely to be violent than non-Hmong or Asian American men who have recently been divorced. There is no published research or data to support this claim.

**3.0. Qualifications**

3.1. I am an Associate Professor of Geography at the University of Wisconsin-Madison, where I have been a faculty member since 2010. I was granted promotion and tenure from the rank of Assistant Professor in 2016. I have also been Director of the Center for Southeast Asian Studies (CSEAS) at UW-Madison since August 2019. In addition, I was hired to be a professor at the University of Wisconsin-Madison primarily because of my expertise with regards to upland peoples in Southeast Asian Studies, and particularly the Hmong. Between 2010 and present I have been the UW-Madison faculty coordinator for the Hmong Studies Consortium (hmongstudies.wisc.edu/).

3.2. I have considerable knowledge about Hmong people, both in Southeast Asia and in the United States. I have been conducting research about Hmong people for 30 years. I first encountered the Hmong in Thailand in 1987. I lived in Thailand between 1987 and 1993. I then moved to neighboring Laos, where I lived until moving back to Canada in 2003. I then spent half-time in Canada and half-time in Laos and Cambodia between 2003 and 2010. Between 2010 and now I have been conducting research about Hmong in the United States and also in Southeast Asia. For example, between August 2016 and July 2017 I lived in Thailand while on sabbatical leave. I was based in Chiang Mai, where I was appointed as an adjunct professor at the Center for Ethnic Studies and Development at Chiang Mai University, one of the leading institutions of higher education in Thailand. I mainly conducted research regarding Hmong people when on sabbatical. I spend about three months a year conducting research in Southeast Asia each year, and I also conduct research in the US during the academic year.

3.3. I completed my Bachelors of Arts in Geography at the University of Victoria (UVic), in Victoria, B.C., Canada in 2000, and I completed my Master's in Geography at UVic in 2003. My Master's project was centered in northeastern Cambodia. I completed my PhD in Geography at the University of British Columbia in Vancouver in 2008. My doctoral dissertation was focused on ethnic minorities in Laos and Cambodia.

3.4. I have been fluent in Thai and Lao languages (speaking, reading and writing) since the late 1980s. I am also fluent in Brao language, and speak some Khmer. My first language is English.

3.5. I have published, or am in the process of publishing, a number of peer-reviewed academic articles and book chapters specifically about Hmong history and politics:

Baird, Ian G. 2020 (Forthcoming). The emergence of an environmentally conscious and Buddhism-friendly marginalized Hmong religious sect along the Laos-Thailand border. *Asian Ethnology*.
Baird, Ian G. and Paul Hillmer 2019 (In Preparation). Veterans from Laos: War, remembrance, ritual, rank, racism, and the making of Hmong and Lao America.
Baird, Ian G. 2019 (In Preparation). The Hmong and the Communist Party of Thailand: A transnational, transcultural and gender relations-transforming experience. In *Memories, Networks and Identities of Transnational and Transcultural Hmong*, Ian G. Baird, Prasit Leepreecha and Mai Na Lee (eds), University of Wisconsin-Madison.
Baird, Ian G. 2019 (Forthcoming). Hmollywood movies: 1.5 generation Hmong Americans and transnational film production in Thailand. *Sojourn: Journal of Social Issues in Southeast Asia*.
Baird, Ian G. 2018. Different Hmong political orientations and perspectives on the Thailand-Laos border. *Georgetown Journal of Asian Affairs* 4(1): 29-36.
Hung, Po-Yi & Ian G. Baird 2017. From soldiers to farmers: The political geography of Chinese Kuomintang territorialization in northern Thailand. *Political Geography* (published online).

Baird, Ian G., Prasit Leepreecha & Urai Yangcheepsujarit 2017. Who should be considered "Indigenous"? A survey of ethnic groups in northern Thailand. *Asian Ethnicity* 18(4): 543-562.

Baird, Ian G. & Pao Vue 2017. The ties that bind: The role of Hmong social networks in developing small-scale rubber cultivation in Laos. *Mobilities* 12(1): 136-154.

Baird, Ian G. 2016. A female monk and the Hmong: Mian Parnchand. Pages 81-83 In Jeffrey Samuels, Justin Thomas McDaniel, Mark Michael Rowe (eds.), *Figures of Buddhist Modernity in Asia*. University of Hawai'i Press, Honolulu.

Baird, Ian G. 2015. Translocal assemblages and the circulation of the concept of "indigenous peoples" in Laos. *Political Geography* 46: 54-64.

Baird, Ian G. 2014. Chao Fa movies: The transnational production of Hmong American history and identity. *Hmong Studies Journal* 15(1): 1-24.

Baird, Ian G. 2012. The monks and the Hmong: The special relationship between the Chao Fa and the Tham Krabok Buddhist Temple in Saraburi Province, Thailand. Pages 120-151 in Vladimir Tikhonov and Torkel Brekke (eds.), *Buddhism and Violence: Militarism and Buddhism in Modern Asia*. Routledge, London.

Baird, Ian G. 2010. The Hmong come to southern Laos: Local responses and the creation of racialized boundaries. *Hmong Studies Journal* 11: 1-38.

I have also published other papers and chapters that relate to Hmong but not as the main ethnic group being written about.

I have also organized major Hmong Studies conferences in 2011, 2013, 2015 and 2017, and I have advised two Hmong Studies PhD students, Dr. Pao Vue and David Chambers (to complete his PhD soon).

See my CV for further details regarding my academic record.

3.6. The following is a list of all other legal cases in which, during the previous 4 years, I have testified in as an expert at trial or by deposition;

3.6.1. I testified as an expert witness for a case (United States vs. Julialath Kouangvan, Criminal #4:14-CR00037) in Des Moines, Iowa. I also submitted a written report in advance of testifying. I was an expert witness for an ethnic Lao woman who was facing potential jail time due to confusion regarding private loans that she took out and then could not pay back. I testified about loaning practices in Laos and amongst Lao Americans, November 12, 2015.

**4.0. Background**

The lawsuit arises out of the firing of Ju Yang, a Hmong woman, by her employer, American Family Insurance Group. At that time, Ms. Yang was in the process of getting a divorce from her husband, also Hmong. The reason cited by American Family for Ms. Yang's firing is that her husband posed a danger to the American Family workplace. Before firing Ms. Yang, American Family sought input from a consultant, and that consultant, Rolf Katzenstein, informed American Family in an e-mail relating to the risk

of danger that Ms. Yang's husband may pose to the workplace that, "In Asian cultures, divorce carries a more severe stigma than in [America]."

4.2. Rolf Katzenstein wrote, in his letter to American Family dated September 9, 2019, that:

"We note that in Asian cultures, divorce carries a more severe stigma than in most western cultures. There is pressure from both families to continue the marriage even with the known risk to the female spouse. Ms. Yang's statement that led the Court to issue to TRO and then the RO, suggests that Mr. Yang does not value his wife's humanity. Cultural differences notwithstanding, the outcome of escalating domestic abuse is well known to all.

There have been ongoing domestic issues being brought to a tragic conclusion in the workplace. Frequently such violence includes otherwise uninvolved third parties. There is no evidence that the matter of Yang vs. Yang is settled. The return of Ms. Yang to the workplace in the near future. If at all, must be considered with the most serious reservation."

4.3. It is true that some Hmong American couples are often pressured by the relatives to not divorce, because when Hmong women marry Hmong men, they join the clan of their husband. When they divorce, they leave the clan of their husbands, but they are typically not allowed to return to their birth clan for taboo reasons (Lee and Tapp 2010; Vang 2010). However, different Hmong Americans have different views on this issue, with many younger people not following this pattern, and there is no data or empirical information to support the idea that Hmong/Asian American men have a greater propensity for violence than others.

## 5.0. **Sources of Information**

In preparing this report, the author was provided with and has thoroughly reviewed the following documents, provided by Daniel G. Jardine:

1. Letter to author from Daniel G. Jardine, dated April 23, 2019, titled: "*Yang v. American Family Mutual Insurance Co.* Case No.: 18-cv-164-wmc"
2. Email from Rolf Katzenstein (Farmington Risk Mgmt.) to William G. Rasche (American Family Insurance), titled "Yang Assessment", September 9, 2010.
3. Phone discussion with Daniel Jardine, *pers. comm.*, April 15, 2019.

## 6.0. My Assessment

6.1. I believe that it is the duty of an expert to help on matters within the expert's own expertise. I believe that this duty is paramount and overrides any obligation to the person from whom the expert has received instructions or by whom the expert is paid, and that furthermore, an expert should assist by providing objective, unbiased opinion on matters within his or her expertise, and should not assume the role of an advocate. In addition, I recognize that an expert should consider all material facts, including those which might detract from his or her opinion, and that an expert should make it clear when a question or issue falls outside his or her expertise; and when the expert

is not able to reach a definite opinion, for example because of insufficient information. I have strictly adhered to these standards when preparing this report.

6.2. I have never met or had any direct contact with Ms. Ju Yang, as far as I know, and have never had any direct or indirect contact with her or any of her relatives or friends. My assessment was based on the documents and other information provided regarding the case of Ms. Yang (see Section 5.0), my own extensive experience and knowledge about Hmong American society and related issues.

6.3. I am qualified to comment on the relevant circumstances associated with Hmong people, due to my over 30 years of living and conducting research in on a variety of topics related to Hmong in Asia and the United States

## 7.0. My Opinion

7.1. Based on the information provided, and my own investigations and overall knowledge of the present-day circumstances with regards to Hmong in the United States and Asia, there is no reason to assume that Hmong or Asian American men going through separations or divorces have a greater propensity for violence than their counterparts with other ethnic and racial backgrounds. There have been no studies done that show that Hmong or Asian American men are more likely to be violent at the workplace than non-Hmong or Asian American men. Therefore, there does not appear to be any basis for assuming this to be the case, or for American Family to follow the advice of their consultant, Rolf Katzenstein.

7.5. If we assume that ex-husbands are more dangerous to workplaces than others (a dubious proposition to begin with), then the logic of American Family is that all recently divorced women pose a risk to their workplaces through their divorced husbands. If all these women were fired as a result, the implications for divorced women would be tremendous and terribly discriminatory and unfair. There is no clear evidence to support this assumption.

## 8.0. Statement of Compliance

8.1. I confirm that this report is my independent product, and that its production has been uninfluenced by the pressures of litigation.

8.2. I understand my duty, and I confirm that I have complied with, and will continue to comply with, that duty.

8.3. I have raised all matters that I consider professionally relevant to this case, and I appreciate my duty to provide an independent assessment uninfluenced by the client of their legal advisors.

## 9.0. Statement of Truth

9.1. I confirm that insofar as the facts stated in my report are within my own knowledge I have made clear which they are and I believe them to be true, and that the opinions I have expressed represent my true and complete professional opinion.

9.2. Compensation related to this study and my testimony is to be $300/hour.

## 10. References

Lee, Gary Yia, and Nicholas Tapp. 2010. Cul*ture and Customs of the Hmong*. Santa Barbara, CA: Greenwood.

Vang, Chia Youyee. 2010. *Hmong America: Reconstructing Community in Diaspora.* Urbana: University of Illinois Press.

Signed,

Ian G. Baird
Associate Professor
Department of Geography
University of Wisconsin-Madison

Dated: April 24, 2019